[No. 20052.  *En Banc.*  April 19, 1927.]

## O. F. LARSON, *Appellant,* v. TACOMA SCHOOL DISTRICT No. 10, *Respondent.*[1]

[1] CONTRACTS (134, 161) — PERFORMANCE — SUFFICIENCY—EVIDENCE. Findings that a contractor was responsible for defective construction in laying a concrete floor in a school building should be reversed as contrary to the preponderance of the evidence, where it appears that he followed the plans and specifications and the fault was due to the failure to provide for expansion joints and to artificial heating in the building before the concrete was dry (PARKER, J., dissenting).

Appeal from a judgment of the superior court for Pierce county, Chapman, J., entered March 11, 1926, upon findings in favor of the defendant, in an action on contract, tried to the court. Reversed.

*Emil N. Stenberg* (*Ellis, Fletcher & Evans,* of counsel), for appellant.

*J. W. Selden, D. D. Schneider,* and *John H. Binns,* for respondent.

¹Reported in 255 Pac. 113.

MITCHELL, J.—This action was brought to recover two thousand dollars alleged to be the balance due on a contract for the building of the Jason Lee school building in the city of Tacoma. The defendant school district counterclaimed. Findings of fact and judgment were entered for the defendant. The plaintiff has appealed.

As the case is presented on the appeal, the controversy is over the ground floor corridor through the building. The finishing of the corridor was not successful. If the appellant was responsible for that result, the judgment is right; if he was not the cause of it, he is entitled to a judgment for two thousand dollars and the counter-claim fails. There was a written contract between the parties including plans and specifications for the building. The original plans and specifications for finishing the corridor floor were modified.

[1] The trial court found that the contractor failed to construct and finish the corridor floors according to the modified plans and specifications, with the result that the floors are badly checked and cracked and the concrete fill laid upon the concrete base is loosened from the base, and the colored surface coating of concrete laid upon the fill is loosened from the fill. No detail is given in the findings as to what the failure to comply with the plans and specifications consisted of. The dominant and controlling contention of the parties is around that finding which in our opinion is opposed to a preponderance of the evidence.

The corridor is two hundred and fifty feet long and about twelve feet wide. It has a concrete base or slab, as it is termed, which on each side connects with and is a part of a concrete base supporting a wall of the corridor, all of which had been constructed in the early

period of the building and had become thoroughly dry before the corridor was to be finished with filling or topping. It was discovered that, by a mistake in the plans and specifications, it became necessary to raise the corridor floors an additional one-half inch to equal the level of the class room floors on either side; and for that purpose, instead of a single filler or finish of one inch, the specifications were modified so that, on the hardened slab, should be laid one inch concrete in the proportion of 1 cement, 3 sand and 5 gravel, and on top of that one-half inch layer consisting of one part cement and two parts sand mixed with color mix. It will be observed, as witnesses testified and of which there was no dispute, the top layer of one-half inch was of richer, denser and more compact material than the one inch layer immediately under it, the latter being composed of more than one-half gravel with no color mix and the top layer having no gravel, only two parts sand with one of cement mixed with coloring.

There is no contention that the material used was not up to standard. Respondent contends that the top layer cracked and that the layers separated in places instead of adhering, because of poor workmanship. The appellant contends that the fillings were laid according to approved and workmanlike method and that the plans and specifications were at fault; and that two thin layers of such material, the top one more susceptible to expansion and contraction because of its being on top and more compact than the others, in such a large surface of twelve by two hundred and fifty feet, without expansion joints (the plans and specifications not providing for any) and bound in solidly on either side by the concrete base of the walls and underneath by the original hardened concrete base or slab must necessarily lead to the disaster or result that happened.

There is no testimony that the architect paid any attention to the performance of this part of the work. The respondent's superintendent of school buildings, who testified that he had the supervision of the construction of the Jason Lee building, was about the construction more or less, but it is not claimed he was versed in concrete construction. The respondent had an inspector on the work at all times who was conversant with what was being done and the manner in which this and all other parts of the work were performed. Neither of them made any objection at all to the manner of doing the work nor to the material that was used.

One qualified expert on behalf of the school district, who had not seen the building nor had either observation or experience in the laying of two fillers of this or other kinds on a concrete slab or base, testified that, in his opinion, they could be successfully laid, and that the failure in this case was attributable to poor workmanship. On the contrary, there was testimony in circumstantial detail of the manner in which the work was done, disputed by no one, which by the great weight of the evidence was the correct method to lay the particular filler and topping. Two workmen, of years of experience to date as concrete finishers, employed on this job testified alike that the fillings were bound to go out constructed as they were by the plans and specifications. Example:

"Q. Were there any expansion joints in the Jason Lee School? A. None; none whatever. Q. It was all one solid slab for 250 feet; and 12 ft. wide? A. Yes. Q. How much experience have you had with concrete, Mr. Benson? A. Been working off and on with it the last 15 or 16 years. Q. What in your opinion is the effect of laying down a top floor of that character be-

tween two solid cement wall bases, without any expansion joint? A. The only way I can see it, it would have to have some place to expand—if it cannot go sideways it surely must go out.''

Another witness of experience in this kind of work who had charge of laying the floor testified:

''They were laid absolutely according to the plans and specifications to the satisfaction of the inspector provided by the school board.''

This was not denied by the inspector nor anyone else. He did not testify on these matters at all. Speaking of the different kinds of material in the two layers this witness testified:

''I will say that the top coat there will expand away ahead of the bottom course. Not only on account of the mixture but because it is right in contact with the heat and cold in the room, where the other one is in between and not subject to the change of atmosphere.''

He further testified that the cause of the cracking of the top layer and separation of the layers from each other was the lack of expansion joints. A number of other witnesses testified to the same effect. We need not set out their testimony. A significant feature of the proof was that another school building in the city built later was provided with expansion joints in the filler on the concrete slab in the corridors and it stood up, while it was otherwise with still another school building and the veterans' hospital at American Lake built about the same time where there were no expansion joints in the filling. The work in question was done the latter part of August and the first of September, being finished on Saturday before school opened in the building on Tuesday. There was artificial heat in the building while the work was going on,

and the testimony shows that such work of concrete finishing should be kept free from heat at least ten days. There is no charge or complaint that the appellant was responsible for the heat in the building.

There was no guaranty of results on the part of the builder in this case. The contract required the builder to

". . . furnish all labor, materials and supplies for and to build, erect, construct and complete the construction of said public school building . . . in accordance with the plans and specifications thereof heretofore prepared by Roland E. Borhek, architect, under the direction of the party of the second part (school district)."

The result in building the corridor was disastrous, but the builder's right to recover is not to be defeated simply because the result contemplated by the school district has not been realized. He must be at fault, else recovery should be allowed. That the builder was not at fault in this case has been established by a preponderance of the evidence in our opinion, as before stated. The fault was in the defective modified plans and specifications furnished by the school district, for which the appellant was in no way responsible under any fair or reasonable construction of the contract.

We do not understand there is any disagreement among counsel as to the law applicable to such cases, but, without quoting from any of them, some of the cases may be mentioned as follows: *Bush v. Jones,* 144 Fed. 942; *Cannon v. Hunt,* 116 Ga. 452, 42 S. E. 734; *MacKnight Flintic Stone Co. v. City of New York,* 160 N. Y. 72, 54 N. E. 661; *Culbertson v. Ashland Cement & Construction Co.,* 144 Ky. 614, 139 S. W. 792; *Bancroft v. San Francisco Tool Co.,* 120 Cal. 228, 52 Pac. 496.

Reversed, with directions to the superior court to enter judgment for the appellant.

MACKINTOSH, C. J., MAIN, FULLERTON, ASKREN, FRENCH, and TOLMAN, JJ., concur.

PARKER, J. (dissenting)—I cannot concur in the disposition of this case made by the foregoing opinion.

Provisions of the specifications, which constitute a part of the contract to be particularly noticed in our present inquiry, are the following:

"All labor to be done in the most thoro and workmanlike manner. . . .

"No certificate given or payment made under the contract nor the occupancy of the premises, either partial or entire, by the owner, shall be conclusive evidence of the performance of the contract, either wholly or in part, and no payment shall be construed to be an acceptance of the work or improper materials. The contractor is to make good any defects arising or discovered in his work within one year after the completion or acceptance of the same but no payments or certificates, either final or otherwise, shall be construed to relieve the contractor from this obligation, nor as a waiver of specific obligation which the contractor may assume as to the durability of his work."

The controlling portions of the trial court's formal findings upon which its conclusion is rested are, in substance, that Larson failed to lay the corridor floors in a workmanlike manner; and because thereof the colormix layer is loosened from the concrete layer on which it rests and is badly cracked and checked. It is plain from the evidence that the floors are in a very bad condition and not at all up to the standard contemplated by the specifications. Whether this is the result of defective specifications or of defective workmanship in construction is the principal question in this case; it being contended in behalf of Larson that it is the result of

defective specifications, in that the one inch layer of uncolored concrete and the one-half inch layer of colormix concrete cannot be so laid as to make the two adhere to each other; while it is contended in behalf of the district that by the exercise of due care, particularly care in laying the colormix layer immediately following the laying of the uncolored layer, they can be made to adhere to each other and become one solid mass, as if laid in one layer one and one-half inches thick, and thus avoid the separation and cracking of the comparatively thin one-half inch colormix layer. The evidence tends to show that the colormix layer was laid for the most part from time to time on the day following the laying of the under layer. The evidence, I think, warrants the conclusion that had they been laid near the same time, as they could have been, they would have adhered together with no material resultant defects. The specifications did not specify the time of laying the colormix layer with reference to the laying of the under layer; but it seems to me that if good workmanship would call for the colormix being laid immediately after the laying of the under layer, as the evidence tends to show, then the specification that "all labor to be done in the most thorough and workmanlike manner" would call for the laying of the colormix layer immediately after the laying of the under layer. Here then seems to be at least one defective method of workmanship used by Larson in the laying of these floors, rendering it highly probable that their later developed defects were the result of such defective method of workmanship.

It is further contended in behalf of Larson, in substance, that, since the architect or his representative was present and saw the floors being laid in the manner above noticed, there was thereby an approval by the

district of the method of laying them and a waiver on the part of the district of any defects in the floors that might develop as the result of such method of laying them. It seems to me that this would be to wholly ignore the provisions of the specifications above quoted. If Larson had been, during the construction of these floors, specifically directed by the architect or his representative to pursue the method that was pursued in the laying of the floors, which the evidence does not show, we might have a somewhat different problem here. It does not seem to me, in the light of this express provision of the contract embodied in the specifications, that the district can be held to have approved Larson's method of laying these floors by merely having failed to direct him to pursue a different method in this detail of the workmanship. In its last analysis, this controversy presents nothing but questions of fact. I cannot see that the evidence preponderates against the learned trial court's findings and conclusions.

The judgment should be affirmed.